Timothy J. Dennin
(TJD 5117)
TIMOTHY J. DENNIN, P.C.
*Attorneys for Plaintiff*
316 Main Street
Northport, New York 11768

UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF NEW YORK
-------------------------------------X
KATHLEEN McCAULEY, Individually and
On behalf of her IRA,

                    Plaintiff,

  -against-                                **COMPLAINT**

VINCENT J. CAMARDA, JAMES E.
McGARTHUR, WINDSOR CAPITAL
FUND, LLC, WINDSOR CAPITAL
FUND MANAGER, LLC, and AG
MORGAN FINANCIAL ADVISORS, LLC

                                        24 Civ. _____

                    Defendants.
-------------------------------------X

      Plaintiff Kathleen McCauley ("Kathleen" or Plaintiff"), by her attorneys, Timothy J. Dennin, P.C., alleges for her complaint against Defendants Vincent J. Camarda (Camarda"), James E. McGarthur ("McGarthur"), Windsor Capital Fund LLC ("Windsor" or the "Fund"), Windsor Capital Fund Manager, LLC ("Manager") and AG Morgan Financial Advisors, LLC ("AGM") (Defendants"), as follows:

1

## SUMMARY

1.      This case involves Defendants' negligent and/or fraudulent misrepresentations regarding the unsuitable recommendations to purchase $450,000 promissory notes in Windsor. This "investment" constituted the vast bulk of Plaintiff's IRA and liquid net worth. Unbeknownst to Plaintiff, at the time of this recommended purchase, Defendants Camarda and McGarthur were being sued in this federal court by the United States Securities and Exchange Commission ("SEC") for securities fraud and the sale of unregistered securities (see *SEC v. AG Morgan Financial Advisors, LLC, Vincent J. Camarda and James McArthur* Case # 2:22 Civ 03421-NJC-ST). The SEC complaint was filed on June 9, 2022 and the unsuitable recommendations and sale of unregistered securities to plaintiff was six months later in December 2022. Plaintiff is 67 years old and retired. Despite being told that this "investment" was safe, secure and offer Plaintiff a steady stream of income for her retirement years, the promised monthly payments stopped in December 2023 and Defendants have refused to return Plaintiff's retirement nest egg. This conduct was willful, wanton and intentional warranting an award of punitive damages.

## JURISDICTION and VENUE

2.      The Court has jurisdiction pursuant to §10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 CFR §240.10b-5] and §21(d), §21(e) and §27 of the Exchange Act [15 U.S.C. §§78u(d), 77u(e) and 78a(a)]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3. Venue lies in this district pursuant to §27 of the Exchange Act [15 U.S.C. §78a(a)]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein, occurred within the Eastern District of New York.

## THE PARTIES

4. Plaintiff, Kathleen McCauley, is 67 years old. Ms. McCauley's formal education ended at high school. After completing high school, Mrs. McCauley worked three years with her ex-husband on a Pepperidge Farm cookie route, and thereafter twenty years for Edy's Ice Cream with a grocery store route. Thereafter Plaintiff worked twenty-one years at Verizon Wireless in retail sales and finally retired on September 4, 2023. She has a thirty-nine year old daughter and three grandchildren. Plaintiff has limited experience in investing and was unsophisticated regarding investments.

5. Plaintiff resides and at all relevant times resided in Nassau County New York.

6. Defendant Camarda, upon information and belief, is the President, Chief Executive Officer ("CEO") and sole owner of Defendant AGM with offices at 5260 Merrick Road, Massapequa, New York. Camarda is also 90% owner of Defendants Windsor and Manager and a managing member of the Manager. Upon information and belief, Camarda resides in Amityville, Suffolk County, New York.

7. According to the Disciplinary Records of the Financial Industry Regulatory Authority ("FINRA"), on June 17, 2022, Camarda was permitted to resign from IBN Financial Services, Inc. According to FINRA, Camarda "resigned" after allegations arose regarding "unlawfully offering and selling securities in connection with a more than $500 million unregistered fraudulent offering with lending company Complete Business Solutions Group

3

Inc., d/b/a Par Funding. The SEC previously charged Par Funding and others with operating a fraudulent scheme that raised hundreds of millions of dollars from investors nationwide."

8. Defendant McGarthur served as Chief Compliance Officer of Defendant AGM and is also a 10% owner of Defendants Windsor and Manager and a managing member of the Manager. Upon information and belief, McGarthur resides in Mount Sinai, Suffolk County, New York.

9. According to the Disciplinary Records of FINRA, on June 17, 2022, McGarthur was permitted to resign from IBN Financial Services, Inc. According to FINRA, McGarthur "resigned" after allegations arose regarding "unlawfully offering and selling securities in connection with a more than $500 million unregistered fraudulent offering with lending company Complete Business Solutions Group Inc., d/b/a Par Funding. The SEC previously charged Par Funding and others with operating a fraudulent scheme that raised hundreds of millions of dollars from investors nationwide."

10. Defendant Windsor is purportedly a private equity investment fund that was organized on September 9, 2020, as a Delaware Limited Liability Company. Windsor's "principal office" is office at 5260 Merrick Road, Massapequa, New York (the same address of AGM). According to an Offering Memorandum dated September 11, 2020, Windsor was an "early stage company" and offering to sell $100,000,000 of 9% or 11% promissory notes to "a select group of investors". According to FINRA Broker Check, Defendants Camarda and McGarthur, devote approximately 2 hours and 10 hours a month respectively, operating Windsor.

11. Defendant Manager is purportedly the sole manager of Windsor and responsible to make all investment decisions for the Fund. Manager was formed on September 9, 2020, as a

Delaware Limited Liability Company. Manager's "principal office" is at 5260 Merrick Road, Massapequa, New York (the same address of AGM). Defendants Camarda and McGarthur are the sole managing members of the Manager and have sole responsibility to direct all operations of the Manager and Windsor. According to FINRA Broker Check, Defendants Camarda and McGarthur, devote approximately 2 hours and 4 hours a month respectively, operating Manager.

12. Defendant AGM is a New York limited liability company formed in 2014 with its office at 5260 Merrick Road, Massapequa, New York. AGM is a Registered Investment Advisor with the SEC. According to a Form ADV filed with the SEC on April 2, 2022 AGM has approximately ten employees and assets under management of $217,000,000. According to FINRA Broker Check, Defendants Camarda and McGarthur, each devote approximately 200 hours a month operating AGM.

## BACKGROUND

13. In November 2022 Plaintiff was contemplating retirement and spoke with her brother, Bill Styne, about what he did with his money. Bill said that he and his wife Debbie had invested their money with AGM and Camarda and were pleased with their services. Bill told Plaintiff that his next door neighbor Joyce also invested with AGM and Camarda and was satisfied with their investment advice and service.

14. Based on this track record, Plaintiff called AGM and made an appointment to see them. Prior to the appointment, AGM mailed Plaintiff forms to complete detailing her monthly cash flow and expenses. Plaintiff completed the forms and had her first meeting with Camarda on November 17, 2022, at AGM's offices. At this meeting, Plaintiff was accompanied by her brother Bill and his wife Debbie.

15. Plaintiff's main objective as expressed at the meeting was to determine if she had enough money to retire and live until she was at least 90 years old. Plaintiff's assets consisted of her $500,000 401-k with Fidelity, $100,000 in CDs and a house she purchased with her sister in Farmingdale. Plaintiff resides at the home and her sister rents out the other half of the house. The present value of the home is approximately $700,000 and it has a $300,000 mortgage. Accordingly, Plaintiff's net value in the home is approximately $200,000.

16. At the meeting, Plaintiff asked Camarda if she had enough assets to retire. After reviewing the work sheets detailing Plaintiff's financial picture, he replied that she "could absolutely retire today!" Camarda told Plaintiff that he had an investment that would enable her to withdraw $3,000 a month from her 401-k and her principal would stay the same. Camarda asked Kathleen "How does that sound?"

17. Camarda represented that the "investment" would go into rare earth minerals, coal, limestone and kiln dust. Camarda stated that the investment would be for 18 months and her principal would remain the same. After 18 months they would reevaluate and determine whether they wanted to stay in or invest in another company that Camarda was working with.

18. According to Camarda, Plaintiff would be guaranteed $3,000 a month after federal taxes being withheld and that if we "do this soon" she would receive her first $3,000 monthly check in February 2023. Plaintiff was extremely relieved to be getting such sound advice and agreed that she should go forward with Camarda's recommendations. Plaintiff made an appointment to come back to the office on December 1, 2022, and go forward with the plan.

19. At the December 1, 2022 meeting, there was a lot of prefilled paperwork that Plaintiff was instructed to sign. Plaintiff followed these instructions and $450,000 of her $500,000 Fidelity 401-k was transferred to CamaPlan, an IRA Administrator (selected by

Camarda) and then immediately wired to a Windsor bank account controlled by Defendants. The $450,000 was purportedly "invested" in an eighteen-month Windsor promissory note issued December 25, 2022, with 9% interest maturing July 2, 2024.

20. In the New Account Information for CamaPlan, which was prefilled out by Defendants, AGM is identified as an "Interested Party" and an "Advisor" to Plaintiff in connection with the $450,000 "investment". This documentation provided Defendant McGarthur's email at AGM and AGM phone number for contact information. Further, the CamaPlan documentation identified Defendants McGarthur and Camarda as the "Asset Provider" in connection with the $450,000 "investment" and the AGM phone number as the contact number.

21. At the time of this investment recommendation, Defendants Camarda and AGM failed to disclose to Plaintiff, *inter alia*, the following material facts:

- the investment was not safe and was wholly unsuitable and inappropriate to invest Plaintiff's retirement nest egg in this security;
- that Plaintiff's retirement was not being invested in an independent entity but an entity owned and controlled by Defendants Camarda and McGarthur;
- the monthly interest and return of principal were not guaranteed but depended on additional funds being deposited/invested by other parties (i.e. Ponzi Scheme);
- the Defendants AGM, Camarda and McGarthur were being sued in federal court by the SEC for securities fraud; and

7

- that Defendants AGM, Camarda and McGarthur, as so called independent investment advisors to Plaintiff, were engaging in a conflict of interest by recommending that Plaintiff invest her retirement into Windsor, an entity owned and controlled by Defendants Camarda and McGarthur.

### **THE UNSUITABLE RECOMMENDATION TO PURCHASE WINDSOR**

22. According to Windsor's Offering Memorandum dated September 11, 2022, prospective investors were required to meet certain "minimum suitability standards" to be qualified to invest. These minimum standards were:

- Investor had to be an accredited investor as defined under Regulation D of the Securities Act of 1933 or the financial capacity of the investor is of such proportion that the total cost of that investor's commitment would not be material when compared with his total financial capacity. It may be presumed that if the investment does not exceed 20% of the investor's net worth at the time of the sale that the amount invested is not material.

- the Offering Memorandum defined an accredited investor as an individual whose net worth, at the time of the purchase of the securities, exceeds $1,000,000 excluding value of primary residence or with an income of at least $200,000 in each of the two most recent years and a reasonable expectation the same income in the current year.

23. Defendants knew or should have known that Plaintiff did not come close to meeting these bare minimum suitability requirements. Prior to this unsuitable "investment" recommendation, Plaintiff provided Defendants with her detailed financial picture. She was not

8

an accredited investor and the $450,000 "investment "was material and constituted the bulk of her assets.

24. Despite this knowledge, Defendants intentionally and fraudulently completed a subscription agreement (after Plaintiff provided her detailed financials) in which Defendants falsely represented that Plaintiff was an accredited investor. This subscription agreement, which was filled out by Defendants, was part of a stack of documents Plaintiff was provided at the December 1, 2022, meeting and instructed to sign.

25. Defendants had an obligation to recommend this investment only to individuals who met the minimum suitability requirements and reject anyone who was not suitable.

26. Defendant McGarthur, as President and behalf of Windsor accepted, in writing, Plaintiff as an investor in Windsor when he and the other Defendants knew or should have known she did not meet the minimum suitability eligibility requirements.

27. Plaintiff received $3,000 a month from February through December 2023. Thereafter no further payments were made.

28. According to the September 11, 2020 Windsor Offering Memorandum, a default on the note occurs when principal or interest are not paid as due within thirty days of notice of non-payment. In the event of a default, the holder may declare all unpaid interest and principal immediately due and payable.

29. From January through April 2024, there were numerous emails exchanged between Plaintiff and Camarda regarding Defendant's default on the note and a steady stream of ever shifting representations from Camarda regarding "delays" on payment of interest due to *inter alia*, purported funding from JD Euroway, an entity called Millenium Holdings, the sale

of the "Business" and other nonsensical excuses with promises that funding was coming soon and that Plaintiff had to be patient.

30. Plaintiff retired on September 4, 2023 and, as known to Camarda, relied on the monthly income that Camarda represented she would receive. Tired of all the broken promises of imminent funding and litany of irrational excuses regarding the reasons for non-payment, on May 10, 2024, Plaintiff emailed Camarda and formally demanded Defendants return her $450,000 plus all unpaid interest. Camarda responded that "[A]s soon as Millenium Holdings gets funded, you will receive your principal and interest. I do expect it to be in the next two weeks."

31. Camarda sent Plaintiff an email dated May 31, 2024, stating that "Anthony" signed the closing documents today and that within thirty days "all of our interest and some of our principal" will be paid.

32. In one of the phone calls in the spring of this year with Plaintiff, her brother, her sister in-law and Camarda, in response to a question by Plaintiff, Camarda identified "Anthony" as Anthony Zingeralli. As reported in the Philadelphia Inquirer, in a motion filed in an SEC's enforcement action against Par Funding (*SEC v. Complete Business Solutions Group d/b/a Par Funding*, No. 9:20-cv-81205 (S.D. Fla. 2020)), Zingeralli was identified as one of Par Funding's financial backers and the "right hand" man of Joseph Laforte, founder of Par Funding. Laforte is in federal prison awaiting a scheduled trial in December 2024 on criminal conspiracy charges. In this same article, the Court Appointed Receiver (for the now defunct Par Funding) in a Court filing reportedly alleged that Par Funding operated as a Ponzi Scheme from 2012-2019 defrauding investors out of hundreds of millions of dollars.

33. On April 11, 2023, the Federal District Court, in the Par Funding case, ordered the litigation injunction lifted to permit the Receiver to pursue claims against Anthony Zingeralli and Millenium Holdings Limited LLC.

34. To date no principal nor interest payments since December 2023 have been paid.

35. On June 26, 2024, TechBullion reported that the Ontario Superior Court, in response to allegations of fraud and misconduct, ordered that JD Euroway and its CEO Fritz Zephir, assets be frozen.

36. In the Case of *SEC v. AGM, Camarda and McGarthur*, Case No. 2:22-cv-03421-NJC-ST, the SEC alleged that AGM and defendants Camarda and McGarthur received more than $7 million in "compensation" from Par Funding in connection with the sales of unregistered securities. As alleged by the SEC, in 2016 and 2017, Par Funding lent AGM hundreds of thousands of dollars in loans which Camarda needed to continue the operations of AGM and avoid personal bankruptcy.

37. Like Par Funding, the instant case has all the hallmarks of a Ponzi Scheme where Plaintiff's investment returns are not contingent on any legitimate business but the receipt of additional (new) funds. It is transparent that this "investment" is merely a house of cards and the walls are starting to close in on these Defendants.

## DUTIES OWED BY CERTAIN DEFENDANTS TO PLAINTIFF

38. As an investor advisor, Defendants AGM, Camarda and McGarthur owed numerous duties to Plaintiff including but not limited to the following duties:

    a. Duties of fair dealing and due care in the rendering of investment advice (See FINRA Conduct Rule 2110; NYSE Rule 401).

11

b. Duties of care, skill, caution, loyalty, utmost honesty and good faith (See *Duker & Duker*, 6 S.E.C. 386-388-389 (1939)).

c. Duty to refrain from self-dealing (See FINRA Conduct Rules 2110 and 2120).

d. Duty to communicate to the Plaintiff all material facts concerning a transaction or recommended security (e.g., the leverage risks, investment risks, conflicts of interest) (See, e.g., FINRA Conduct Rule 2120 and 2210).

e. "Know Your Security" suitability duty, i.e., the duties of broker-dealers and registered representatives to recommend a security only after studying it sufficiently to become informed as to is nature, characteristics, and financial prognosis and to inform the customer of the risks involved in purchasing or selling a particular security (See *Lester Kuznetz*, 48 S.E.C. 550, 554 (1986); *Edward J. Blumenfeld*, 47 S.E.C. 189, 190-191 (1979)).

f. Duty to refrain from effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance (See FINRA Conduct Rule 2120).

g. Contractual, statutory and common law duties and to conform to industry standards of professional conduct as set forth by the rules, regulations, requirements and customs of the SEC, FINRA and the NYSE.

h. Duty of Camarda as owner and CEO of AGM to establish and enforce effective procedures to supervise all sales and annuity recommendations to ensure that they complied with the statutes, rules and regulations of the SEC, and FINRA (See e.g., Section 15(b)(4)(E) of the Securities Exchange Act;

12

NYSE Rules 342 and 405; NASD Conduct Rule 3010).

39. Violations of self-regulatory organization rules of conduct are evidence of a person's failure to meet the standard of care to which they are held. See e.g., *Quick & Reilly, Inc. v. Walker*, 1991 U.S. App. LEXIS 5472, at 8 (1991) (NASD "suitability" rules were relevant to establish duty of care to which reasonable broker must adhere; jury found broker negligent); *Miley v. Oppenheimer & Co.*, 637 F2d 318, 33 (5th Cir. 1981) (NYSE and NASD rules are excellent tools to assess reasonableness or excessiveness of broker's handling of investor's account); *FSLIC v. Shearson-American Express, Inc.*, 658 F.Supp. 1331, 1344 (D.P.R. 1987) (NYSE rule provided standard of evidence to support claim that securities firm failed to control the actions of its employees); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker negligence); *Lange v. H. Hentz & Co.*, 418 F.Supp. 1376, 1383-84 (N.D. Tex. 1976) (proven violation of NASD rules should be a factor in determining what standard should be applied to stock brokerage industry and as evidence of standard of care which NASD members should achieve); *Piper, Jaffrey & Hopwood, Inc. v. Ladin*, 399 F.Supp. 292, 299 (S.D. Iowa 1975) (NYSE and NASD suitability rules admissible evidence of negligence).

40. Defendants breached their duties as investment advisors through the conduct described above, including recommending the $450,000 Promissory Note when these Defendants knew or should have known that this investment was wholly unsuitable to meet Plaintiff's investment objectives, financial needs and risk tolerance. Further, Defendants breached their duties by misrepresenting that this "investment" would provide a reliable steady stream of retirement income and her principal would be safe and secure. Defendants knew that Plaintiff did not come anywhere close to meeting the minimum suitability requirements to invest

in this unregistered offering and instead falsified the subscription agreement stating that she was an accredited investor.

## CLAIMS FOR RELIEF COUNT ONE

### Against all Defendants for Fraud in Connection with the Purchase of Sale of Securities in Violation of §10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

41. Plaintiff realleges and incorporates herein paragraphs 1 through 40 above.

42. The Defendants knew, or were reckless in failing to know, of the material misrepresentations and omissions contained in the statements set forth above. From at least November 2022 through the present, these Defendants, directly or indirectly, singly or in concert, have made, and are making, use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities issued by Windsor, have knowingly, or with recklessness: (a) employed, or are employing devices, schemes, or artifices to defraud; (b) made, or are making, untrue statements of material facts, or have omitted, or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged, or are engaging, in acts, practices, or courses of business which have operated, or are operating, as a fraud or deceit upon persons, in connection with the purchase or sale of securities purportedly issued by Windsor.

43. Plaintiff has suffered substantial damages, in that, upon reliance on Defendants' misrepresentations concerning the Windsor security as well as the nature of the investments in Windsor as detailed above, Plaintiff entrusted Defendants with Four Hundred and Fifty Thousand Dollars ($450,000) which was converted by Defendants for their own use and the use

of entities controlled or owned by the Defendants. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined, will continue to violate §10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## COUNT TWO
## FOR CONVERSION AGAINST all DEFENDANTS

44. Plaintiff realleges and incorporates herein paragraphs 1 through 43 above.

45. By virtue of the foregoing, Defendants were unjustly enriched through the monies derived as proceeds of the fraud and the Four Hundred and Fifty Thousand Dollars ($450,000) that they received from the Plaintiff, and for which Defendants did not give adequate consideration. These monies were directed to Defendants as a result of the illegal conduct of the Defendants.

46. Defendants have converted the monies entrusted to them by Plaintiff and as a direct result, Plaintiff has suffered injuries in the amount of Four Hundred and Fifty Thousand Dollars ($450,000).

## COUNT THREE
## FOR FRAUD AGAINST all DEFENDANTS

47. Plaintiff realleges and incorporates herein paragraphs 1 through 46 above.

48. Defendants individually, and in various conspiracies with one another, engaged in wrongful, fraudulent and otherwise illegal schemes to steal monies from Plaintiff, and to otherwise defraud Plaintiff, by misrepresenting that Plaintiff's life savings was invested in hard assets, i.e. a company mining rare earth minerals, coal, limestone and cement kiln dust which would provide approximately 9% interest per year with safety of principal when in reality

Plaintiff's life savings were deposited into a Windsor bank account controlled by Defendants Camarda and McGarthur.

49. Plaintiff reasonably relied on Defendant Camarda's representations as CEO and owner of AGM, that Plaintiff's monies were invested in safe and secure investments and would provide approximately 9% interest a year.

50. As a direct result, Plaintiff has suffered injuries in the amount of Four Hundred and Fifty Thousand Dollars ($450,000).

## COUNT FOUR
### FOR UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

51. Plaintiff realleges and incorporates herein paragraphs 1 through 50 above.

52. Defendants obtained hundreds of thousands of dollars from Plaintiff as a result of aforesaid illegal and fraudulent conduct.

53. As a result, Defendants have been unjustly enriched.

54. As a direct result Plaintiff has suffered injuries in the amount of Four Hundred and Fifty Thousand Dollars ($450,000).

## COUNT FIVE
### FOR EQUITABLE RELIEF INCLUDING ACCOUNTING AGAINST ALL DEFENDANTS

55. Plaintiff realleges and incorporates herein paragraphs 1 through 54 above.

56. Defendants have transferred $450,000 of Plaintiff's monies to a bank account controlled by Defendants. It appears that Plaintiff's money was not invested in a mining company but used by Defendants for their own personal gain and purposes. Plaintiff requests that this Court order that Defendants provide a full accounting as to what happened to Plaintiff's monies after it was deposited into a First National Bank LI account controlled by Defendants.

## COUNT SIX
**FOR BREACH OF CONTRACT AGAINST ALL DEFENDANTS**

57.  Plaintiff realleges and incorporates herein paragraphs 1 through 56 above.

58.  Defendants defaulted on the $450,000 Note by failing to pay interest and principal as due. Despite Plaintiff providing timely written notice of the default and demanding return of principal and all interest due, Defendants have failed to do so and as such violated their contractual obligations under the terms of the Windsor Offering Memorandum dated September 11, 2020.

## COUNT SEVEN
**FOR NEFLIGENCE AGAINST ALL DEFENDANTS**

59.  Plaintiff realleges and incorporates herein paragraphs 1 through 58 above.

60.  Defendants were negligent with respect to their failure to exercise reasonable care in connection with the sale of the $450,000 Windsor "investment" and use of the retirement monies Plaintiff entrusted to Defendants.

61.  As a result of Defendants' negligence, Plaintiff sustained damages in the amount of $450,000.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

 a. Damages in the amount to be determined at trial, such amount being more than $450,000;

 b. Reasonable costs and disbursements of this action;

 c. Attorneys' fees;

 d. Interest;

 e. Punitive damages; and

f.      Any other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Dated: Northport, New York
        July 16, 2024

TIMOTHY J. DENNIN, P.C.
*Attorneys for Plaintiff*

BY: _____

Timothy J. Dennin
New York State Bar # 2362424
316 Main Street
Northport, New York 11768
(631) 261-0250